Dear Chief Agnew:
You ask this office to advise if the establishments known asChrissy's Restaurant, Bennie's Wings Restaurant, andExpose may continue to operate in the City of Bogalusa without possessing alcoholic beverage permits from either the state or local authorities. We also address the following collateral issue: in the absence of state regulations, are establishments operating as "bottle clubs" allowed to operate without alcoholic beverage permits from the state?
The facts surrounding the operation of each business, as related in your letter (discussed, infra), first prompt our examination of the provisions of state law regulating alcoholic beverages. Chapter One of Title 26, La.R.S. 26:1, et seq., regulates businesses dealing in beverages of high alcoholic content, orliquor. Chapter Two of Title 26, La.R.S. 26:241, etseq., regulates businesses dealing in beverages of low alcoholic content, or beer.
The Commissioner of the Louisiana Office of Alcohol and Tobacco Control issues alcoholic beverage permits on behalf of the state.[1] Under the regulatory provisions of Title 26, any person or business that does any act as a dealer must *Page 2 
obtain an alcoholic beverage permit from the state.[2] Under La.R.S. 26:2(5), a "dealer" is a person who, as a business,manufactures, blends, rectifies, distills, processes, imports,stores, uses, handles, holds, sells, offers for sale, solicitsorders for the sale of, distributes, delivers, serves, or transportsany alcoholic beverage in the state or engages herein in anybusiness transaction relating to any such beverage.
Any person or business that operates as a dealer without first obtaining the proper alcoholic beverage permits from the state violates La.R.S. 26:75 and/or La.R.S. 26:275. The penalty for violating either statute is a fine not to exceed five hundred dollars or imprisonment not to exceed six months.[3] Both La.R.S. 26:75 and La.R.S. 26:275 provide "each day's conduct of business by [a] dealer without such a valid, unsuspended permit constitutes a separate violation of this Chapter."
I. Types of Permits issued by the Commissioner to businesseswhich either sell alcoholic beverages for consumption on thepremises, or supply alcoholic beverages while charging an admissionfee.
In the state of Louisiana, the sale of alcoholic beverages is subject to a complex regulatory scheme.[4] Our discussion here primarily focuses on those permits, issued by the Commissioner on behalf of the state, to businesses which either sell alcoholic beverages for consumption on the premises, or supply alcoholic beverages for consumption on the premises as part of a general admission fee or other type fee.[5] These permits are: (i) theClass A Retail Permit-Bar, (ii) the *Page 3 
Class R Restaurant Permit, (iii) the Class A Caterer's Permit,and (iv) the Special Events Permit (Type A, B, or C).
In the following examination, we review some of the distinguishing characteristics separating one permit from the other. Our examination is not meant to reflect the entirety of the qualifications a particular applicant must possess to be eligible to receive any of the described alcoholic beverage permits, and should not be relied upon as such.
(i) Class A Retail Permit-Bar.
The state issues a Class A Retail Permit to bars or taverns selling alcoholic beverages for consumption on the premises.[6] To qualify as a bar, a business must meet the following requirements: liquor is sold on the premises for consumption on the premises by paying customers; the establishment is equipped with a permanent wet bar equipped with a non-movable sink and backbar for public display to inform the public of brands and flavors offered for sale; and the business is staffed by a bartender.
(ii) Class R Restaurant Permit.
The state issues a Class R Restaurant Permit to a restaurantestablishment, in conjunction with a Class A Retail Permit, in order for the restaurant to sell alcoholic beverages of low and high alcoholic content for consumption on the premises.[7] A business is a restaurant establishment where the following requirements are met: the average monthly revenue from food and nonalcoholic beverages exceeds fifty percent of its total average monthly revenue from the sale of food, nonalcoholic beverages, and alcoholic beverages; food is served on all days of operation; the business operates a fully equipped kitchen used for the preparation of uncooked foods for service and consumption on the premises; and the business has a public habitable floor area of no less than five hundred square feet.[8] *Page 4 
(iii) Class A Caterer's Permit.
Those catering businesses which do not otherwise qualify as a restaurant, but which operate a facility with a fully equipped kitchen where food is prepared for the purpose of catering functions, are eligible to obtain a Class A Caterer's Permit if the business derives seventy percent of its gross annual revenue from the sale of food, and the business derives forty percent of the gross revenue per event from the sale of food; the business must also maintain separate sales figures for alcoholic beverages.[9]
(iv) Special Events Permits.
Special events are defined as "events, held at any location, where alcoholic beverages are served as an incidental part of the event for payment rendered or are supplied as a part of a general admission or other type fee."[10] For special events, the state issues three types (Types A, B, and C) of special temporary retail alcoholic beverage permits, which are valid for a maximum duration of three consecutive days.[11] No more than 12 such permits are issued to any one person during a calendar year.[12]
Type A permits are issued only to non-profit organizations with tax exempt status under the United States Internal Revenue Code, Sections 501(c)(3) and 501(c)(8). To qualify for this permit, applicants must submit written proof of their tax exempt status, a copy of a local permit or letter from the local governing authority granting their permission to sell alcoholic beverages, and a valid lease, contract or written permission of the owner of the property on which the event is to be held if the property is not owned by the applicant. Type A permits are issued with no charge.[13]
Type B permits are issued only to non-profit organizations which are able to provide some type of written proof of their non-profit status, but are unable to show written proof of their tax exempt status under the Internal Revenue Code sections cited above. To qualify for this permit, applicants must submit the same documentation as for Type A permits, substituting the written proof of non-profit *Page 5 
status for the written proof of tax exempt status. Type B permits as assessed a $10 fee.[14]
Type C permits are issued to persons holding limited events where alcohol beverages are sold or supplied as part of a general admission or other type fee, but who do not meet the requirements for Type A or Type B temporary permits. To qualify for a Type C temporary permit, applicants must meet the qualifications required of permit holders under R.S. 26:80 and R.S. 26:280 and must submit a copy of a local permit or letter from the local governing authority granting them permission to sell alcoholic beverages, a valid lease or contract with the owner of the property on which the event is to be held if it is not owned by the applicant and a completed, notarized application form. Type C permits are assessed a $100 fee.[15]
With respect to the Class A Retail Permit-Bar, the Class R Restaurant Permit, the Class A Caterer's Permit, and the Special Events Permit, the state seeks to regulate and hold accountable those businesses which either sell alcoholic beverages forconsumption on the premises, or serve alcoholic beverages forconsumption on the premises as part of a general admission fee orother type fee.
Within this permit structure, the state prohibits the unlicensed sale of alcoholic beverages by all persons and businesses. State law does not provide an exemption from licensure to a person or business operating as a "private club" where alcohol is sold to the club members.[16] The regulatory provisions of Title 26 apply to "private clubs as well as public enterprises." See
La. Atty. Gen. Op. 89-59.
Further, there is no general exemption from licensure based upon the status of a business as a non-profit organization. Both non-profit corporations and commercial businesses which sell alcoholic beverages or serve alcoholic beverages as part of a general admission fee or other type fee must obtain a retail license from the state.[17] It is our opinion that the permit structure *Page 6 
established by the legislature, and as implemented by the Commissioner through authorized regulations, would become meaningless if the requirements of state law could be avoided by simply incorporating as a non-profit organization or private club.
State law recognizes that parishes and municipalities may, by ordinance, establish a classification scheme for the issuance of local alcoholic beverage permits similar to those issued by the Commissioner.[18] Thus, an applicant for any of the foregoing described alcoholic beverage permits issued by the Commissioner may be required to obtain a similar permit from the parish and municipal governing authorities.
We now turn to an examination of whether or not a person or business is allowed to engage in certain alcohol-related commercial activities without an alcoholic beverage permit from the state. Specifically, we address whether state law regulates a business operating as a "bottle club."
II. A business operating as a bona fide bottle club isnot required to obtain a Title 26 permit from the state.
Our review here is limited to a business operating as a "bottle club", where the establishment does not sell liquor but provides mixers, soft drinks, and drink set-ups. Such a business typically provides musical entertainment, charges an admission fee, and allows patrons to consume their own liquor on the premises. SeeLiberto v. Rapides Parish Police Jury, 95-456 (La. App. 3 Cir. 11/2/95) 667 So.2d 552, 552; rehearingdenied, (La. App. 3 Cir. 2/26/96).
At the outset, we note that Title 26 of the Louisiana Revised Statutes does not define the phrase "bottle club", nor do the Title 26 provisions contain any licensing requirements for an establishment operating as a bottle club. Title 26 does not currently provide for a bottle club permit, nor has the Commissioner promulgated any regulation establishing such a permit. *Page 7 
Here we must determine if the legislature intended to require a "bottle club" operator to obtain an alcoholic beverage permit from the state as a condition precedent to the legal operation of his business. Under La.R.S. 26:75(B), any business which "does any act as a dealer" is required to have an alcoholic beverage permit issued by the state. "Dealer" is defined by La.R.S. 26:2(5), which provides:
 (5) "Dealer" means any person who, as a business, manufactures, blends, rectifies, distills, processes, imports, stores, uses, handles, holds, sells, offers for sale, solicits orders for the sale of, distributes, delivers, serves, or transports any alcoholic beverage in the state or engages herein in any business transaction relating to any such beverage.
[Emphasis added].
Does a business operating as a "bottle club" fall within the definition of "dealer" under La.R.S. 26:2(5)? One could argue that the phrase "engages . . . in any business transaction relating to any such beverage" provided in La.R.S. 26:75(B) includes a business selling mixers and soft drinks to patrons for use in connection with the consumption of alcoholic beverages brought upon the premises by these patrons. This phrase, standing alone, might support such a conclusion; however, the statute must be interpreted in its entirety, and applying the rules of statutory construction, as we are required to do, we reach a different conclusion.
Under the ejusdem generis rule of statutory construction, general words, such as "other, etc.", following an enumeration of particular or specific classes or things are to take color from the specific, so that the general words are restricted to a sense analogous to the less general. General words in a statute are not to be construed in their widest extent, but are to be held as applying only to such classes of things of the same general kind as those specifically mentioned. See Pumphrey v. City of New Orleans, 2005-979 (La. 4/4/06) 925 So.2d 1202, 1211, citing ContinentalGroup, Inc. v. Allison, 404 So.2d 428, 431, n. 4 (La. 1981) andHall v. Rosteet, 247 La. 45, 169 So.2d 903, 907-08 (1964).
The principle of ejusdem generis as applied to La.R.S. 26:2(5) may also be expressed as the idea that if a list of examples is given, then other regulated activity will be assumed to be of a similar nature. Under La.R.S. 26:2(5), a "dealer" performssome act upon alcoholic beverages, whether the dealer "manufactures", "processes", "stores", "handles", "sells", or "serves" alcoholic beverages. It follows that the phrase "engages herein in any business transaction relating to any such beverage" requires the business to perform some positive act of a similarnature upon alcoholic beverages in order for the business *Page 8 
to be considered a "dealer". Additionally, a punitive or criminal statute such as La.R.S. 26:75 or La.R.S. 26:275 must be construedstricti juris, meaning that ambiguities are resolved in favor of the accused. State v. Shreveport News Agency, Inc.,287 So.2d 464, 469 (La. 1973).
A business which does not sell, serve, or in any way provide alcoholic beverages cannot be considered to perform some positiveact regarding the alcoholic beverages necessary to place the business within the definition of "dealer." In the absence of this positive act, we cannot interpret "dealer" to include a "bottle club" based only upon the provision of facilities or the sale of mixers and soft drinks by the operator. These acts do not of themselves provide sufficient connexity between a "bottle club" business and alcoholic beverages for the "bottle club" operator to be considered a "dealer" under La.R.S. 26:2(5).
As already noted, with respect to the Class A Retail Permit-Bar, the Class R Restaurant Permit, the Class A Caterer's Permit, and the Special Events Permit, the state seeks to regulate and hold accountable those businesses which either sell alcoholicbeverages for consumption on the premises, or serve alcoholicbeverages for consumption on the premises as part of a generaladmission fee or other type fee. In the opinion of this office, these types of licenses are not designed for the licensing of abona fide bottle club, where the operator does not sell, provide, serve or handle alcoholic beverages.
It is the opinion of this office that the failure of a bottle club operator to hold a state alcoholic beverage permit does not currently constitute an offense under state law. An element of the offense prosecuted for violations of La.R.S. 26:75 or La.R.S. 26:275 is the performance of some unlicensed act as a dealer La.R.S. 26:2(5), and as discussed, the operator of a bottle club does not engage in the acts of a dealer under La.R.S. 26:2(5).
There is one case in which a court interpreted the provisions of Chapter Two of Title 26 to authorize regulation of a business allowing patrons to consume alcoholic beverages on the premises. SeeLiberto v. Rapides Parish Police Jury, supra. However, at issue in Liberto was the regulatory authority of the parish relative to an ordinance imposing closing hours on an after-hours bottle club. Liberto did not concern permitting or licensing issues. It is our opinion that Liberto cannot be relied upon to establish state licensing and state permit requirements for a bottle club which are non-existent in the state law.
It has been suggested to this office that the operation of a bottle club is automatically prohibited because current state law does not provide for a "bottle club permit." Our research reflects no Louisiana jurisprudence supporting this assertion. Bottle clubs "are not mala in se nor mala prohibita and are therefore to *Page 9 
be considered lawful business enterprises."[19] See Segal v.Simpson, 121 So.2d 790, 792 (Fla. 1960). Although it was not an issue in Liberto, the holding in that decision, arguably, may tacitly recognize that bottle clubs are allowed.
Further, in the absence of a local option election resulting in a prohibition of the sale of alcoholic beverages, the sale of alcoholic beverages is deemed permitted.[20] Attendant to this jurisprudential holding is the idea that a bottle club may operate until such time as its operation is prohibited or otherwise regulated under state law. "If [a business] is permitted to be conducted, it is presumed to be a legitimate occupation; otherwise, the legislature, instead of authorizing it, would have passed necessary laws to suppress it." See City of New Orleans v.Collins, 52 La.Ann. 973, 978; 27 So. 532 (La. 1900).
By its very nature, a bottle club operator does not engage in the activities that a dealer engages in, as defined by La.R.S. 26:2(5), because a bottle club operator does not "manufacture", "process", "store", "handle", "sell", or "serve" alcoholic beverages. Thus, we advise that the operator of a bona fide
bottle club, which does not sell or serve alcoholic beverages to its patrons, does not engage in activities which would require the operator to possess alcoholic beverage permits issued by the state under Title 26 of the Louisiana Revised Statutes.
However, whether or not an establishment is operating legitimately as a bottle club, and is not otherwise engaged in the illegal sale of alcoholic beverages, is a question of fact. Such factual determinations are made by the investigators of the Commissioner's office, and local law enforcement agencies, to ensure that a business purporting to be a legitimate bottle club is not "a sham designed to circumvent the Alcohol Beverage Control laws." SeeAdams v.Traina, 36,306 (La. App. 2 Cir. 10/25/02) 830 So.2d 526, 533;writs denied, 2002-2844, 2002-2898 (La. 02/07/03) 836 So.2d 101-02. *Page 10 
While it is our opinion that the State of Louisiana does not currently regulate bottle clubs, we acknowledge the authority of the legislature to in the future enact legislation imposing permit requirements upon bottle clubs. A state's authority to regulate the distribution and consumption of alcoholic beverages comes not only from the traditional source of police power, but also from theTwenty-First Amendment of the U.S. Constitution. State v.Larson, 94-1237 (La. 4/10/95) 653 So.2d 1158, 1164. Under such broad authority, the state regulation of bottle clubs has been upheld in other jurisdictions.[21] "Bottle clubs are not exempt from the exercise of this power merely because they do not sell liquor. Bottle clubs are business enterprises designed to facilitate the on-premises consumption of alcoholic beverages, and therefore may be regulated to the same degree as establishments in which alcoholic beverages are sold." See State v. Lambert,409 A.2d 794, 796 (N.H. 1979).
Other states have created separate and distinct classifications for "bottle clubs" within state laws regulating alcoholic beverages. Delaware, Florida, Maine, New York, Oklahoma, and Washington are some of the states which have enacted licensure requirements specifically for bottle clubs within the state's liquor laws, making it unlawful for an operator of a bottle club to conduct business without a license issued by the state.[22] *Page 11 
Left unanswered is whether the local governing authorities may enact ordinances imposing permit and licensing requirements upon establishments operating as bottle clubs, where the state has refrained from doing so. The facts in the instant matter reflect that the City of Bogalusa has no regulation concerning the operation of bottle clubs, making it unnecessary for us to address this issue.
Of interest here are two appellate court decisions which validated local ordinances regulating bottle club establishments. The first case is Liberto v. Rapides Parish Police Jury, supra, in which the court upheld a parish ordinance regulating the closing hours of an after-hours bottle club. The Liberto court viewed the ordinance as a "limited regulation as necessary to the accomplishment of a proper purpose within the inherent police power of the police jury", finding the ordinance "a legitimate exercise of the police jury's police power." Id. at 558, 559.
A municipal ordinance which prohibited the operation of all bottle clubs was upheld in West Central Louisiana Entertainment,Inc. v. City of Leesville, 594 So.2d 973 (La. App. 3 Cir. 1992). The West Central court considered a municipal ordinance making it "unlawful for a holder of a city occupational retail license . . . whose principal business is that of amusement . . . to permit patrons of his establishment to consume or possess alcoholic beverages" and found it valid as applied to a an after-hours bottle club. Noting that "these clubs do not apply for nor do they need a liquor license", and in reliance upon the police power afforded the municipality, the court concluded:
 The ordinance is rationally related to the legitimate government objectives of reducing alcohol consumption by minors and crimes committed by intoxicated persons. Additionally, protecting minors from the corrupting influences of older patrons of a business has been held to be a legitimate city effort. [citations omitted.] The ordinance in question is a valid exercise of defendant's police power. Municipalities have broad discretion in regulating the liquor business to protect the public from fraud and corruption. [citations omitted.] This ordinance is designed to accomplish a purpose properly falling within the scope of the police power. Id. at 976.
At this juncture, we summarize as follows: It is the opinion of this office that, while the State of Louisiana has the authority to regulate bottle clubs pursuant to the Twenty-First Amendment, at this time bottle clubs are unregulated under state law. For this reason, the operator of a bona fide bottle club is not required *Page 12 
to obtain alcoholic beverage permits from the state. A local ordinance imposing closing hours upon the hours of operation of a bottle club, or a local ordinance prohibiting the operation of a bottle club, may be validly enacted pursuant to the respective cases of Liberto and West Central, supra.
III. The City of Bogalusa alcoholic beverage ordinance.
Chapter 4 of the Bogalusa Code of Ordinances, enacted under state law permitting a municipality to adopt a permit structure similar to that of the state, [23] is entitled "Alcoholic Beverages" and contains the city's alcoholic beverage ordinance. Section 4-26 of Article II of Chapter 4 provides "it shall be unlawful for any person to sell or offer for sale, or to have in possession for sale, any intoxicating, spirituous, vinous or malt liquors containing more than one-half of one percent of alcohol by volume as defined in R.S. 26:2 and 26:241 without first obtaining a permit to engage in such business from the city."
Further, Section 4-5 of Article I of Chapter 4 subjects alllicensed persons to the following closing hours:
 Sec. 4-5. Hours sales prohibited.
 (a) Except as provided in (d) below, it shall be unlawful for any person, licensed under this chapter or any agent or employee of such person to sell, give, serve or permit to be sold, given or served, spirituous, vinous or malt liquors of an alcoholic content of more than one-half of one percent by volume between the hours of 1:00 a.m. and 6:00 a.m. on any day, and except as provided in (d) below, it shall be unlawful for any such licensee or any agent or employee of such licensee under the provisions of this chapter to sell, give, serve or permit to be sold, given or served, any such liquors between the hours of 1:00 a.m. each Sunday and 6:00 a.m. the following Monday.
 (b) It shall also be unlawful for any person to consume any alcoholic beverage in any licensed premises serving alcoholic beverages as herein defined during the hours prohibited in (a) above.
 (c) The presence of any drink or beverage which has been poured from or is in an open original container within the licensed premises other than in the usual and customary place of storing it during the *Page 13 
closing hours prescribed in (a) above shall be prima facie evidence of a violation of this chapter.
 (d) Bona fide fraternal, religious, charitable, benevolent and private organizations that have received a letter of determination from the United States Internal Revenue Service acknowledging that they are classified as a nonprofit organization are exempt from the provisions of this section regarding closing hours.
 We interpret the above cited provisions as follows: (1) theCity of Bogalusa imposes permit requirements on persons orbusinesses which sell alcoholic beverages; (2) Non-profitorganizations which sell alcoholic beverages are subject tolicensure in the City of Bogalusa; (3) the City of Bogalusa does notimpose permit requirements on bottle clubs; (4) those establishmentswhich sell alcoholic beverages are required to be licensed by theCity and are subject to the City's closing hours; and (5) the City'sclosing hours are only applicable to those establishments requiredto hold alcoholic beverage permits and therefore are inapplicable tobottle clubs.
We now turn to an analysis of both state law and the provisions of the City of Bogalusa alcoholic beverage ordinance as applied to the operation of the businesses known as Chrissy's Restaurant,Bennie's Wings Restaurant, and Expose. The following conclusions of this office are based upon the facts as related in your correspondence.
IV. Chrissy's Restaurant.
Chrissy's Restaurant possesses an occupational license to operate as a restaurant, issued by the City of Bogalusa. This establishment caters dinner to private groups and businesses. If a request is made for beverages of alcoholic content, such beverages are served along with the meal. The fee charged for this meal (including the service of alcoholic beverages, when requested) is a flat rate at a cost of so much per person.
Is Chrissy's Restaurant required to obtain a state and cityliquor license in order to serve alcohol at these privatedinners?
It is the opinion of this office that by serving alcoholic beverages as part of a catered meal, Chrissy's Restaurant engages in the sale of alcoholic beverages for consumption on the premises. This is so even if Chrissy's Restaurant makes no specific or extra charge for serving alcoholic beverages; the sale of alcoholic beverages occurs by including the cost in the package price for the meal. *Page 14 
Section 4-26 of the Bogalusa alcoholic beverage ordinance makes it unlawful for a business to sell intoxicating liquors without first obtaining a city permit. It is our opinion that Chrissy's Restaurant, as a business engaged in the sale of alcoholic beverages for consumption on the premises, must obtain an alcoholic beverage permit from the city under Section 4-26. Chrissy's must also obtain the proper alcoholic beverage permit from the state, in order to avoid prosecution for the illegal sale of alcoholic beverages under La.R.S. 26:75 and La.R.S. 26:275. Further, neither state law nor the city ordinance provides an exemption from licensure to Chrissy's Restaurant on the basis that the business sells and serves alcohol at "private dinners."
While we conclude that Chrissy's Restaurant, as a business selling alcoholic beverages for consumption on the premises, must be licensed to do so by the state and the City of Bogalusa, we are unable to determine from the limited facts provided whether the owner of Chrissy's Restaurant must obtain a Class R Restaurant Permit, in conjunction with a Class A retail permit, or if the Class A Caterer's Permit is the proper permit which Chrissy's must obtain from the state. We make no such determination here, as this is an issue appropriately reviewed and resolved by the Commissioner.[24]
V. Bennie's Wings Restaurant.
Bennie's Wings possesses an occupational license to operate as a restaurant, issued by the City of Bogalusa. Bennie's Wings leases a portion of the building it occupies to individuals for parties and other social events. You have provided us with a copy of a lease document entitled "Wings and Things Building Agreement." The agreement allows the lessee to rent space for four hours at the rate of $450.00. The agreement provides "owner of wing [sic] and things not responsible for alcohol brought on the property." From the lease document, we surmise that Bennie's Wings seeks to absolve the business from any liability associated with the sale or consumption of alcoholic beverages on the premises during the event.
Should Bennie's Wings be required to obtain a state and cityliquor license?
The state primarily seeks to regulate and hold accountable those businesses, owners, and operators which are the source of the alcoholic beverages sold for consumption on the premises. If the owner of Bennie's Wings does not sell or serve alcoholicbeverages, he cannot be required to obtain state and local liquor permits under the current regulatory regime. *Page 15 
Further, as we have previously determined, state law does not provide any licensure requirements for a business operating as a bottle club; neither does the City of Bogalusa ordinance provide for the regulation of bottle clubs. If neither Bennie's Wings nor its lessee sells or serves alcoholic beverages, but instead is operating as a bottle club by permitting patrons to bring their own liquor on the premises for consumption there, neither Bennie's Wings nor its lessee is required to obtain alcoholic beverage permits from the city or the state.
However, you state that the City of Bogalusa police department has received complaints that the "events" held at Bennie's Wings continue after 1:00 a.m. in the morning, that a cover charge is collected at the door for admission to the event, and that alcoholic beverages are sold for consumption on the premises. From the facts provided, either the owner of Bennie's Wings, or its lessee, or both, engage in activity falling within the category of "special events" as defined by law. "Special events" are "events, held at any location, where alcoholic beverages are served as an incidental part of the event for payment rendered or are supplied as a part of a general admission or other type fee."[25] A person or business engaging in such activity must obtain a Special Events Permit from the state and an alcoholic beverage permit from the city.[26]
We cannot determine here whether the "events" at Bennie's Wings, prompting complaints to be filed with your office, were conducted by the owner of Bennie's Wings or by Bennie's Wings' lessee. Such factual determinations are not the province of this office. Rather, the business or person here accountable depends upon the facts as assessed by the Commissioner and local law enforcement agencies.[27]
Should Bennie's Wings be required to obtain a separateoccupational license from the city for the part of the buildingthat is being leased?
The power of local governing units within the state to levy and collect annual occupational license taxes is regulated by Title 47, Sub-Title II, Chapter 3 of the Louisiana Revised Statutes, La.R.S. 47:341, et seq. Similar provisions have *Page 16 
been adopted by the City of Bogalusa.[28] Both state law and the City of Bogalusa ordinance require only one occupational license for each place of business.[29]
Bennie's Wings currently operates as a restaurant under an occupational license issued by the City of Bogalusa. Bennie's Wings, as a restaurant business leasing a portion of the building for social events, engages in a "similar or associated type of business . . . operated . . . under a single roof" under state and local law pertaining to occupational licenses, requiring the issuance of only one occupational license.[30] However, a business leasing space for social events qualifies as a service business[31] under state law and the City of Bogalusa ordinance; such a business must also pay occupational license taxes to the City of Bogalusa.[32]
It is the opinion of this office that while Bennie's Wings is not required to obtain a separate occupational license, the owner of Bennie's Wings is required to include any additional gross sales he derives from leasing the premises for social events within the total gross sales he reports to the City of Bogalusa for his restaurant business, for purposes of calculating the amount of occupational license taxes owed the City of Bogalusa.[33] *Page 17 
Should Bennie's Wings be required to abide by the closing hoursprovisions of the City of Bogalusa alcoholic beveragesordinance?
Section 4-5 of Article I of Chapter 4 of the City of Bogalusa alcoholic beverage ordinance makes it "unlawful for any person,licensed under this chapter or any agent or employee of such person to sell, give, serve or permit to be sold, given or served" alcoholic beverages "between the hours of 1:00 a.m. and 6:00 a.m. on any day" and further prohibits such activity "between the hours of 1:00 a.m. each Sunday and 6:00 a.m. the following Monday". These restrictions apply to those businesses required to obtain licenses from the city for the sale of alcoholic beverages, but are not applicable to establishments operating as bottle clubs.
We note here that the City of Bogalusa could amend its closing hours ordinance to apply to establishments operating as bottle clubs, on the theory that such an ordinance would be a lesser regulation than the prohibition upheld as valid in West Central,supra.
If the appropriate authorities determine that either Bennie's Wings or its lessee is engaged in activity falling within the category of "special events," we advise that the person or business responsible is required to obtain a Special Events Permit from the state and an alcoholic beverage from the city, and would be aperson licensed under this chapter subject to the closing hours provisions of the ordinance.
Again, whether or not Bennie's Wings or its lessee is engaged in business activity for which state and city alcoholic beverage permits are required is a factual determination to be made by the Commissioner and law enforcement of the City of Bogalusa.[34]
VI. Expose.
The business called Expose possesses an occupational license to operate as a dance hall, issued by the City of Bogalusa. This business leases building space to individuals for birthday parties and wedding receptions. The Expose lease agreement reflects a rental fee of $600.00. By signing the lease agreement, a lessee agrees with the following written provision contained in the lease, that "alcohol can be served at private events and I'm aware that the sell [sic] of alcohol isn't allowed." The lease agreement further provides that "Expose is a non-profit organization". We have rephrased your questions, as follows, in order to address those legal issues prompted by the language of the lease document. *Page 18 
Must Expose or the lessee obtain a city liquor permit in thesecircumstances?
Our conclusion regarding Bennie's Wings is applicable here: if neither Expose nor its lessee sells or serves alcoholic beverages, neither Expose nor its lessee is required to obtain alcoholic beverage permits from the city or the state.
The facts related reflect that Expose does not provide or serve alcoholic beverages as part of the event, and as limited to these facts, it is our opinion Expose is not required to obtain a permit from the city or the state.
Whether or not Expose's lessee is engaged in activity falling within the category of a special event, requiring state and city permits, is a fact-sensitive question, to be determined on a case-by-case basis. For instance, if the Expose premises are leased for a wedding reception, and the lessee gratuitously serves alcoholic beverages to wedding guests, we are of the opinion that such activity does not fall within the definition of a "special event" requiring a permit to be issued by the state. However, if the lessee sells alcoholic beverages to party guests at a cash bar, such activity would require the lessee to obtain a Special Events Permit from the state, and an alcoholic beverage permit from the city.[35]
Wedding receptions are often catered events, in which the caterer provides the alcoholic beverages under the Caterer's Class A Permit. In these circumstances, it is our opinion the Expose lessee would not be required to obtain any further permits from the city or the state.
Should Expose be required to abide by the closing hoursprovisions of the City of Bogalusa alcoholic beverageordinance?
As previously discussed, the closing hours provided in the Bogalusa alcoholic beverage ordinance apply only to those businesses required to obtain licenses from the City of Bogalusa for the sale of alcoholic beverages. If neither Expose nor its lessee sells or serves alcoholic beverages, and if instead, either entity operates as a bona fide bottle club, the Expose premises would not be subject to the closing hours of the city ordinance.
A determination by either the Commissioner or local law enforcement that either Expose or its lessee is engaged in activity requiring alcoholic beverage permits from the state and the city would subject the Expose premises to the city's ordinance establishing closing hours for such permittees. Further, if alcoholic beverages for the event are supplied by an establishment holding a Class A *Page 19 
Caterer's Permit, then the Expose premises would, in our opinion, become a licensed premises subject to the closing hours of the city ordinance.
Is Expose a non-profit organization?
As we have previously discussed, supra, the provisions of Title 26 apply to both private organizations and commercial establishments, where the entity as part of its business activitysells alcoholic beverages for consumption on the premises. The language provided in the City of Bogalusa ordinance similarly limits this licensure requirement to those businesses which sell alcoholic beverages.[36]
The City of Bogalusa's alcoholic beverage ordinance exempts from the observance of closing hours those establishments holding city liquor permits, which are non-profit organizations.[37]
Apparently, this question arises because Expose has asserted that it is not subject to the closing hours imposed by the ordinance because of its non-profit status.
Under the city ordinance, a non-profit establishment holding an alcoholic beverage permit from the city is exempt from observance of the city's closing hours. The legal ability of Expose to disregard the closing hours imposed by the ordinance is not based upon its (alleged) non-profit status; rather, the facts related indicate that Expose is not engaged in activity requiring alcoholic beverage permits, and for this reason, Expose is not subject to the closing hours of the ordinance.
Further, even if Expose is a bona fide non-profit entity, such status would not work to exempt the premises from the closing hours of the ordinance, where Expose's lessee engages in "special events" activity requiring the lessee to hold alcoholic beverage permits from the city and the state. Expose's lessee would also have to be a non-profit entity in order to exempt the leased premises from closing hours.
It is not the function of this office to make factual determinations; rather, our conclusions here are necessarily based upon the facts as you have related them. In the final analysis, it remains the responsibility of local law enforcement and the Commissioner to investigate allegations of activity in violation of state and local laws regulating alcoholic beverages, and to make an assessment of the alcoholic beverage permits which a business or person must obtain for legal operation. *Page 20 
VII. Summary. Based upon and limited to the facts as provided in your letter,we advise the following:
It is our opinion that Chrissy's Restaurant must obtainalcoholic beverage permits from the state and the City ofBogalusa.
 It is our further opinion that "special events" requiringalcoholic beverage permits from the state and the city are currentlyheld on the Bennie's Wings' premises, but this officemakes no finding as to whether the events are conducted by the ownerof Bennie's Wings or by its lessee. Such factual determinations mustbe made by the Commissioner and local law enforcement agencies.
 It is our opinion that Expose is not engaged in activityrequiring alcoholic beverage permits from the city or the state.Whether or not Expose's lessee is engaged in activity requiringalcoholic beverage permits is fact-sensitive, and must be determinedon a case-by-case basis. An Expose lessee need not obtain any cityor state permits for the event if the alcoholic beverages areprovided by an establishment holding a Class A Caterer'sPermit.
 It is our opinion that all persons or businesses required toobtain alcoholic beverage permits from the City of Bogalusa aresubject to the city's closing hours.[38] Where the circumstanceswould relieve either Bennie's Wings or Expose from responsibilityfor obtaining alcoholic beverage permits, the lessee of eitherbusiness subjects either premises to the closing hours of the cityordinance where the lessee is engaged in activity requiringalcoholic beverage permits. Further, the premises of bothestablishments are subject to the city's closing hours if Bennie'sWings or Expose's lessee sells or serves alcoholic beverages as abusiness holding a Class A Caterer's Permit.
 Finally, it is our opinion that bottle clubs are not regulatedunder state law. Because the city ordinance provides no regulationfor bottle clubs, establishments operating in the City of Bogalusaas bona fide bottle clubs are not required to obtain alcoholicbeverage permits from the city or state and are not subject to thecity's ordinance imposing closing hours. *Page 21 
We hope the foregoing is helpful to you. Should you have other questions in which we may provide assistance, please contact this office.
Very truly yours,
JAMES D. "BUDDY" CALDWELL ATTORNEY GENERAL
BY: __________________________ KERRY L. KILPATRICK ASSISTANT ATTORNEY GENERAL
KLK:arg
Mr. Murphy J. Painter State Commissioner Louisiana Office of Alcohol and Tobacco Control P.O. Box 66404 Baton Rouge, LA 70896-6404
[1] "Commissioner" as used throughout the Title 26 provisions regulating the sale of alcoholic beverages means the Commissioner of Alcohol and Beverage Control. See La.R.S. 26:2(3) and La.R.S. 26:241(3).
[2] La.R.S. 26:75(B) provides "a permit is required of any person who does any act as a dealer." La.R.S. 26:275(A) provides "no person shall do any act for which a permit is required by this Chapter or by local authorities acting hereunder unless he holds the proper state and local permits . . ."
[3] A violation of La.R.S. 26:75 is punishable under La.R.S. 26:171, while a violation of La.R.S. 26:275 is punishable under La.R.S. 26:521. Both La.R.S. 26:171 and La.R.S. 26:521 subject the offender to a mandatory fine of "not less than one hundred dollars nor more than five hundred dollars" or imprisonment "for not less than thirty days nor more than six months, or both."
[4] See Chapters One and Two of Title 26 of the Louisiana Revised Statutes; see also Title 55, Part VII, Subpart 1, Chapter 3 of the Louisiana Administrative Code, entitledAlcoholic Beverage Permits.
[5] The state also issues retail permits pertaining to the package sales of alcoholic beverages for consumption off the premises.See the Class B and Class C Permits, provided for by La.R.S. 26:71(A)(3)(iii)(b) and (c). However, those permits are inapplicable in the instant matter, and for that reason are not discussed.
[6] La.R.S. 26:71.1(1)(a) provides for the issuance of liquor permits to businesses operating as bars. Similar provisions relevant to the issuance of beer permit to bars are found in La.R.S. 26:271.2(1).
[7] La.R.S. 26:71.1(2).
[8] La.R.S. 26:73(C) provides this definition of "restaurant establishment" for those businesses seeking liquor permits; corresponding provisions relevant to the issuance of a beer permit to a restaurant establishment are found in La.R.S. 26:271.2(2). A similar definition for "restaurant establishment" pertaining to beer permits is found in La.R.S. 26:272(C)(1).
[9] LAC 55:VII.325(A)(3).
[10] LAC 55.VII.323(A).
[11] LAC 55:VII.323(B).
[12] Id.
[13] LAC 55:VII.323(B)(1)(a).
[14] LAC 55:VII.323(B)(1)(b).
[15] LAC 55:VII.323(B)(1)(c).
[16] The legislature has not provided a definition for the phrase "private club" within the provisions of Title 26 of the Louisiana Revised Statutes. However, in La. Atty. Gen. Ops. 90-380, 88-447 and 88-68 this office concluded that "private club" may be generally defined as a club belonging to a particular group of persons, not common or general, joined to the same end.
[17] A business organized as a non-profit corporation does enjoy a benefit regarding the issuance of the Special Events Permits. There is no charge for the issuance of a Type A permit to an eligible non-profit corporation; only a $10 charge is assessed for the issuance of a Type B permit to an eligible non-profit corporation; and a business ineligible for a Type A or Type B permit must pay $100 for the issuance of a Type C special events permits. In other words, those persons or businesses which cannot establish a non-profit status must pay $100 for the issuance of a Type C special events permit.
[18] La.R.S. 26:74(A) provides that "parishes and municipalities may require annual permits and fees from dealers holding state permits under this Chapter . . ." La.R.S. 26:274(A) provides "parishes and municipalities may issue and require local permits similar to those issued by the commissioner and may charge and collect fees therefore . . ."
[19] "Mala prohibits offenses are acts that are crimes merely because they are prohibited by statute, although they are not necessarily immoral. [citations omitted.] Examples include speeding, illegal dumping of trash, and possession of a firearm while under a domestic restraining order. By contrast, offenses requiring a culpability requirement are normally considered malum in se or "inherently evil." They are acts that are inherently immoral such as rape, arson, and murder . . . regulatory violations are often characterized as mala prohibita offenses . . ." SeeState v. Howard, 172 S.W.3d 190 (Tex. App. 2005). The illegal sale and consumption of alcohol is a matter to be treated as a public welfare or regulatory offense. Morissette v.United States,342 U.S. 246, at 262 n. 20, 72 S.Ct. 240, at 249 n. 20,96 L.Ed. 299 (1952). A public welfare or regulatory offense "has been traditionally exempt from the mens rea requirement . . ." See State v.Larson, 94-1237 (La. 4/10/95) 653 So.2d 1158, 1162, holding that La.R.S. 26:90, "as part of the Alcoholic Beverage Control Law . . . is a public welfare offense for which scienter is not required." Id. at 1162.
[20] See Sabine Parish Police Jury v. Commissioner of Alcoholand Tobacco Control, 04-1833 (La. 4/12/05)898 So.2d 1244, at page 1245, n. 1.
[21] See State v. Chisholm, 4 Conn. Cir. 565, 237 A.2d 101 (1967); Grillo v. State,209 Md. 154, 120 A.2d 384 (1956); Beacon Club v. Buder,332 Mich. 412, 52 N.W.2d 165, appeal dismissed for want of a substantial federal question,343 U.S. 971, 72 S.Ct. 1077, 96 L.Ed. 1366 (1952); Arrow Club,Inc. v. Nebraska Liquor Control Commission,177 Neb. 686, 131 N.W.2d 134 (1964); Kent Club v. Toronto,6 Utah 2d 67, 305 P.2d 870 (1957).
[22] Delaware makes it "unlawful to operate for profit or pecuniary gain a bottle club" unless the operator holds a license from the state. See Del. Code 4:515A. Florida also makes it "unlawful for any person to operate a bottle club" without a license from the state. See Fla. Stat. 34:562.121. Maine defines "bottle club" as a person operating on a regular, profit or nonprofit basis a facility for social activities in which members or guests provide their own liquor, where no liquor is sold on the bottle club premises, which maintains suitable facilities for the use of members on a regular basis or charges an admission fee to members or the general public and where members, guests or others are regularly permitted to consume liquor. See Me. R.S. 28-A:2. Further, under Maine law, the state may not register a bottle club unless the operator is qualified to receive a liquor license; the operation of a bottle club after denial of registration constitutes a strict liability crime. See Me. R.S. 28-A:161 (1-C). New York provides a "license to sell liquor on premises commonly known as a bottle club" and makes it "unlawful for any person . . . operating a place for profit or pecuniary gain, with a capacity for the assemblage of twenty or more persons to permit a person or persons to come to the place of assembly for the purpose of consuming alcoholic beverages on said premises, which alcoholic beverages are either provided by the operator . . . or are brought onto said premises by the person or persons assembling at such place, unless an appropriate license has first been obtained from the state liquor authority . . ." See N.Y. Alco. Bev. Cont. § 64-b. Pursuant to Okla. Stat. 37:506(6), the state of Oklahoma defines "bottle club" as "any establishment in a county which has not authorized the retail sale of alcoholic beverages by the individual drink, which is required to be licensed to keep, mix, and serve alcoholic beverages belonging to club members on club premises"; further, Okla. Stat. 37:518(A)(13) provides an initial bottle club license fee of $1000.00 and an annual $900 fee for renewal. In Washington, "except as permitted under a license issued by the Washington state liquor control board", it is unlawful for any person to operate a bottle club. See Wash. Rev. Code 66:66.24.480.
[23] See La.R.S. 26:74(A) and La.R.S. 26:274(A), fn. 18, supra.
[24] See La.R.S. 26:146.
[25] See LAC 55:VII.323(A).
[26] Pursuant to Section 4-26 of Article 2 of Chapter 4 of the City of Bogalusa alcoholic beverage ordinance, making it unlawful for a business to sell alcoholic beverages in the absence of a permit from the city.
[27] The Commissioner is authorized to investigate complaints alleging unlicensed activity pursuant to La.R.S. 26:146, which provides "no person shall refuse to allow the commissioner, or his agents or employees, to make an inspection of any place or business where alcoholic beverages are stored, sold or handled, or otherwise hinder or prevent the inspection."
[28] See Chapter 10 of the City of Bogalusa Code of Ordinances, entitled "Licenses and Business Regulations."
[29] La.R.S. 47:346 is entitled "separate license required for each location, based on primary class of business". The statute provides that ". . . only one license shall be required for each place of business, and the license shall be based upon the classification of business which constitutes the major portion of the taxable annual gross sales and receipts . . ." A similar provision is found within Chapter 10, Article II, Section 10-53 of the City of Bogalusa Code of Ordinances.
[30] La.R.S. 47:342(11) provides "as used in La.R.S. 47:346 of this Chapter, a `separate location' exists unless a similar or associated type of business is operated as a unit under a single roof or on the same contiguous tract of land." A similar provision is found in Chapter 10, Article II, Section 10-21 of the City of Bogalusa Code of Ordinances.
[31] La.R.S. 47:354(B)(46) includes service businesses within a list of businesses subject to occupational license taxes. A similar provision is found in Chapter 10, Article II, Section 10-77(b)(46) of the City of Bogalusa Code of Ordinances.
[32] La.R.S. 47:341 (A) permits any municipality or parish to impose occupational license taxes, provided such license tax is approved by two-thirds of the elected members of the municipal governing authority. Chapter 10, Article II, Section 10-76 of the City of Bogalusa Code of Ordinances levies an annual occupational license tax "upon each person pursuing and conducting any business, trade, calling, profession or vocation . . ."
[33] See Chapter 10, Article II, Section 10-77 of the City of Bogalusa Code of Ordinances.
[34] See La.R.S. 26:145.
[35] Id., n. 25.
[36] See Section 4-26 of Article II of Chapter 4 of the City of Bogalusa Code of Ordinances.
[37] See Section 4-5(c) of Article I of Chapter 4 of the City of Bogalusa alcoholic beverage ordinance.
[38] Exempt here are the non-profit entities which are required to hold alcoholic beverage permits from the City of Bogalusa. See Section 4-5(d) of Article I of Chapter 4 of the Bogalusa Code of Ordinances.